IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | |
|---|---|
| PAULETTE HOLMES, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) CIVIL CASE NO. 3:21-cv-578-ECM |
| | ) [WO] |
| FRESNIUS KIDNEY CARE OF TUSKEGEE, | ) |
| | ) |
| | ) |
| Defendant. | ) |

**MEMORANDUM OPINION and ORDER**

**I. INTRODUCTION**

Now pending before the Court is a motion for summary judgment filed by defendant Bio-Medical Applications of Alabama, Inc., d/b/a Fresenius Kidney Care Tuskegee ("BMA"). (Doc. 66). Plaintiff Paulette Holmes ("Mrs. Holmes") alleges loss of consortium due to BMA's negligent and wanton handling of her husband, Steven Holmes ("Mr. Holmes"). Based on a thorough review of the record, briefs, and applicable law, for the reasons to be discussed, the motion for summary judgment is due to be GRANTED.

**II. JURISDICTION**

The citizenship of the parties is completely diverse and the amount in controversy exceeded $75,000, exclusive of interests and costs, at the time of filing. (Doc. 2). Therefore, the Court has subject matter jurisdiction over this dispute pursuant to 28 U.S.C. § 1332. Personal jurisdiction and venue are uncontested.

## III.  STANDARD OF REVIEW

"Summary judgment is proper if the evidence shows 'that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Hornsby-Culpepper v. Ware*, 906 F.3d 1302, 1311 (11th Cir. 2018) (quoting Fed. R. Civ. P. 56(a)).  "[A] court generally must 'view all evidence and make all reasonable inferences in favor of the party opposing summary judgment.'" *Fla. Int'l Univ. Bd. of Trs. v. Fla. Nat'l Univ., Inc.*, 830 F.3d 1242, 1252 (11th Cir. 2016) (citation omitted).  However, "conclusory allegations without specific supporting facts have no probative value." *Jefferson v. Sewon Am., Inc.*, 891 F.3d 911, 924–25 (11th Cir. 2018) (citation omitted).  If the record, taken as a whole, "could not lead a rational trier of fact to find for the non-moving party," then there is no genuine dispute as to any material fact. *Hornsby-Culpepper*, 906 F.3d at 1311 (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

The movant bears the initial burden of demonstrating that there is no genuine dispute as to any material fact, and the movant must identify the portions of the record which support this proposition. *Id.* (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)); Fed. R. Civ. P. 56(c).  The movant may carry this burden "by demonstrating that the nonmoving party has failed to present sufficient evidence to support an essential element of the case." *Hornsby-Culpepper*, 906 F.3d at 1311.  The burden then shifts to the non-moving party "to establish, by going beyond the pleadings, that a genuine issue of material fact exists." *Id.* at 1311–12.  The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.*,

2

475 U.S. at 586. Non-movants must support their assertions "that a fact cannot be or is genuinely disputed" by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A) & (B).

In determining whether a genuine issue for trial exists, the court must view all the evidence in the light most favorable to the non-movant. *Fla. Int'l Univ. Bd. of Trs.*, 830 F.3d at 1252. Likewise, the reviewing court must draw all justifiable inferences from the evidence in the non-moving party's favor. *Id.* However, "mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) (per curiam).

### IV.  FACTS

The facts, stated in the light most favorable to the non-movant, are as follows:

Mr. Holmes had surgery on his neck on February 26, 2019. He was kept overnight and discharged the next day. On March 1, 2019, Mr. Holmes had an appointment for dialysis at Fresenius Kidney Care Dialysis Clinic in Tuskegee ("the Clinic"). As he walked to his truck that morning to drive to his appointment, his legs went weak, his knees buckled, and he fell to the ground. Mrs. Holmes called the staff at the Clinic to let them know that

Mr. Holmes had fallen on the way to his truck.[1]  After helping him up, Mrs. Holmes then drove Mr. Holmes to the clinic.

Upon arrival, Mrs. Holmes walked in and alerted staff that she needed help, and they brought a wheelchair out to Mr. Holmes. (Docs. 68-3 at 16, 68-4 at 7).  A nurse and Mrs. Holmes helped Mr. Holmes into the wheelchair, and he was wheeled into the clinic to his dialysis chair.  No fall risk assessment was performed.

Mr. and Mrs. Holmes' son, Steven Holmes, Jr., was also receiving dialysis treatment at the clinic at that time.  His dialysis chair was near the nurses' station, and he overheard a "member of the staff," possibly a nurse, direct the nurses to use the volunteer fire department if there was heavy lifting. (Doc. 72-3 at 3).

Mr. Holmes was unable to get into his dialysis chair by himself.  Rather than use a lifting tool such as a Hoyer lift,[2] the nursing staff decided to use two firemen from the Tuskegee Fire Department to help transfer Mr. Holmes to the dialysis chair.  Mr. Holmes weighed nearly 300 pounds.

The two firemen stood with one on either side of Mr. Holmes and lifted him from his wheelchair.  When Mr. Holmes was in front of his dialysis chair, the two firemen allegedly "turned [him] loose, and [he] dropped to the floor." (Doc. 68-3 at 16).  This drop

---

[1] In her deposition, Felicia Butler, the corporate representative of BMA, testified that Mrs. Holmes "had called that morning to tell them that" Mr. Holmes had fallen. (Doc. 68-5 at 36).  Mr. Holmes testified that he could not remember whether a phone call was made. (Doc. 68-3 at 15).  Mrs. Holmes was not asked about making a phone call.  Therefore, this fact is undisputed.

[2] A Hoyer lift is a patient lift used by caregivers to safely transport immobile patients between a bed, chair, or other similar resting place.  It allows a person to be lifted, typically in a seated position in the lift's sling, and transferred to another surface with a minimum physical effort by the use of manual, hydraulic, or electrical power.  Hoyer lifts are commonly used in hospitals, nursing homes, and other health care facilities.

allegedly caused an injury to his back. This back injury allegedly caused Mrs. Holmes to sustain a loss of consortium, specifically that she had to do things for her husband that he could not do for himself. (Doc. 68-4, at 15; 52:17–19).

Mr. and Mrs. Holmes brought a complaint in the Circuit Court of Macon County, Alabama. Mr. Holmes asserted negligence and wantonness against BMA, and Mrs. Holmes brought a derivative loss of consortium claim. Subsequently, BMA removed the action to this Court. On June 6, 2022, Mr. Holmes passed away, and because no timely substitution of party was made, the Court dismissed Mr. Holmes from the action. (Doc. 43). BMA later filed the pending motion for summary judgment.

## V.  DISCUSSION

The only remaining claim is Mrs. Holmes' derivative loss of consortium claim. As described below, because Mrs. Holmes fails to submit sufficient evidence to support the underlying claims of negligence and wantonness, her loss of consortium claim fails. Accordingly, BMA's motion for summary judgment is due to be granted.

Mrs. Holmes alleges that the back injury her husband sustained when he was dropped during transfer at the Clinic is due to the negligence and wantonness of BMA, and that the injury caused a loss of consortium in her marriage. (Doc. 2-1 at 2). To prove her loss of consortium claim, Mrs. Holmes must present sufficient evidence to show that BMA caused injury to Mr. Holmes because "[u]nder Alabama law, a loss of consortium claim is derivative of the claims of an injured spouse." *Katrensky v. United States*, 732 F. Supp. 2d 1194, 1204–05 (M.D. Ala. 2010); *see also Ex parte N.P.*, 676 So. 2d 928, 930 (Ala. 1996);

5

*Johnson v. Wal-Mart Stores, Inc.*, 987 F. Supp. 1398, 1406 (M.D. Ala. 1997) ("proof of the underlying tort is a necessary element of an action for loss of consortium").

### A. The Alabama Medical Liability Act

The underlying claims allege theories of negligence and wantonness occurring at the clinic resulting in a back injury. Because the injury occurred in a medical facility while Mr. Holmes was attempting to receive dialysis treatment, the parties debate whether the Alabama Medical Liability Act ("AMLA") applies to the underlying claims. Determination of whether the AMLA applies establishes Mrs. Holmes' burden of proof for the underlying claims.

Mrs. Holmes claims that the AMLA does not apply because "there was no nursing judgment made in this case. The two firemen were not medical personnel. They were not providing treatment." (Doc. 72 at 22). Rather, according to Mrs. Holmes, her husband was the "victim of straight negligence." (Doc. 72 at 22). BMA argues that the AMLA applies because the decision to use firemen to move Mr. Holmes into his dialysis chair was both a nursing judgment and "reasonably related" to the "provision of health-care services," specifically, dialysis treatment. (Doc. 77 at 5–6).

The AMLA "shall govern . . . all aspects of the action" "[i]n any action for injury . . . whether in contract or in tort, against a health care provider for breach of the standard of care, whether resulting from acts or omissions in providing health care." Ala. Code § 6-5-551. The AMLA is not limited to medical malpractice cases. *Collins v. Ashurst*, 821 So. 2d 173, 176 (Ala. 2001) ("This particular section provides the applicable standard of care that governs all actions against the health-care providers specified in the act; it does not

contain language that would lead to the conclusion that the only available cause of action, in contract or in tort, is medical malpractice.").

The Supreme Court of Alabama has explained that the AMLA "applies to conduct that is, or that is reasonably related to, the provision of health-care services allegedly resulting in a medical injury." *Ex Parte Vanderwall*, 201 So. 3d 525, 537 (Ala. 2015) (quoting *Mock v. Allen*, 783 So. 2d 828, 837 (Ala. 2000) (Lyons, J. dissenting)).  It further stated that the "AMLA is not just concerned with who committed the alleged wrongful conduct or when and where that conduct occurred, but also with *whether the harm occurred because of the provision of medical services*." *Id.* (emphasis in original).

Mrs. Holmes cites to *Vanderwall* in support of her opposition to summary judgment, but there are factual distinctions between it and the underlying claims.  In *Vanderwall*, a physical therapist groped his patient without administering any medical treatment.  The Court held that the AMLA did not apply, reasoning that "there was no therapeutic or medical reason for [Vanderwall] to touch M.S.'s breasts or genitals." *Id.* at 538.  In contrast, there was a medical reason for the firemen to assist Mr. Holmes into the dialysis chair: so he could receive dialysis treatment.

The underlying claims are more factually akin to *Washington v. Bio-Medical Applications of Alabama, Inc.*, 2018 WL 2225278 (M.D. Ala. Jan. 31, 2018), *report and recommendation adopted*, 2018 WL 2224059 (M.D. Ala. May 15, 2018).  In *Washington*, a woman known to be a fall risk had finished her dialysis session and was transported in a wheelchair to an area near the treatment floor. 2018 WL 2225278, at 1.  While she waited unattended for her son to pick her up, she fell from her wheelchair and struck her head. *Id.*

7

at 1.  This Court was "persuaded that since Ms. Washington was a dialysis patient with other health issues, the duty of care inquiry relates to that of a reasonable nurse under the circumstances specific to Ms. Washington." *Id.* at 2.  The court "conclude[d] that the Defendant's duty of care . . . extended to the health care services provided to ensure Ms. Washington's safety while at the clinic." *Id.* at 3.  Thus, the AMLA applied because "the nursing services provided to Ms. Washington at the clinic, *including those involving her use of a wheelchair*, were themselves 'health care services' or were 'reasonably related to the provision of health care services' such that [the] AMLA applies and governs the parameters of this action." *Id.* at 3 (quoting *Vanderwall*, 201 So. 3d at 537) (emphasis added).

Similar to *Washington*, Mr. Holmes was a dialysis patient suffering from other health issues as evidenced by his neck surgery a few days prior, his legs going weak, and his knees buckling that morning.  Moreover, the staff was aware that Mr. Holmes had fallen that morning. (Doc. 68-5 at 36).  BMA's duty of care extended to the services provided to ensure Mr. Holmes' safety while at the clinic, including safely moving him from one chair to another.  Mrs. Holmes points out that "Fresenius was duty-bound to provide safe movement within the clinic, including movement from one chair to another." (Doc. 72 at 24).  Thus, like in *Washington*, the nurses' judgment in the method of transferring Mr. Holmes from the wheelchair to the dialysis chair is a "health care service" or "reasonably related" to the "provision of health care services." *Vanderwall*, 201 So. 3d at 537.

Moreover, this Court explained in *Washington* that a closer question of applicability would be one where "a patient with no increased risk of falling came to the clinic for

8

dialysis treatment and slipped and fell while at the clinic." *Washington*, 2018 WL 2225278, at 2. That is not the situation here. Mr. Holmes did have a risk of falling because he had fallen earlier in the day, necessitating his use of a wheelchair. Although the staff did not perform a fall risk assessment on Mr. Holmes (doc. 68-5 at 22), the undisputed evidence shows that they were aware that he had fallen that morning (doc. 68-5 at 36). Further, Mrs. Holmes does not allege a slip and fall. Rather, she claims her husband was dropped during his transfer from a wheelchair to a dialysis chair.

Accordingly, the AMLA applies to the underlying claims of negligence and wantonness. The nurses' decision to use two firemen to transfer Mr. Holmes into his dialysis chair was "reasonably related" to the "provision of health care services" because Mr. Holmes needed to be in the dialysis chair to receive his treatment. *Vanderwall*, 201 So. 3d at 537 (quoting *Mock*, 783 So. 2d at 837 (Lyons, J. dissenting)). Dialysis treatment is a provision of health care services. The fact that Mr. Holmes did not actually receive that medical treatment at the time of the incident does not preclude application of the AMLA. The transfer of Mr. Holmes from the wheelchair to the dialysis chair was medically necessary for him to receive dialysis treatment, and thus, was "reasonably related" to the "provision of health care services." *Id.* at 537.

### B. Expert Testimony

When the AMLA applies, "the plaintiff shall have the burden of proving by substantial evidence that the health care provider failed to exercise such reasonable care, skill, and diligence as other similarly situated health care providers in the same general line of practice ordinarily have and exercise in a like case." Ala. Code § 6-5-548. To meet this

9

burden, a plaintiff "ordinarily must present expert testimony from a 'similarly situated health-care provider' as to (1) 'the appropriate standard of care,' (2) a 'deviation from that standard [of care],' and (3) 'a proximate causal connection between the [defendant's] act or omission constituting the breach and the injury sustained by the plaintiff.'" *Lyons v. Walker Reg'l Med. Ctr.*, 791 So. 2d 937, 942 (Ala. 2000) (quoting *Pruitt v. Zeiger*, 590 So. 2d 236, 238 (Ala. 1991)).  A "narrow exception to this rule exists 'in a case where want of skill or lack of care is so apparent . . . as to be understood by a layman, and requires only common knowledge and experience to understand it.'" *Ex parte HealthSouth Corp.*, 851 So. 2d 33, 38 (Ala. 2002) (quoting *Tuscaloosa Orthopedic Appliance Co. v. Wyatt,* 460 So. 2d 156, 161 (Ala. 1984)).

Mrs. Holmes argues that the underlying claims fall within this narrow exception because the decision to use "miscellaneous, unknown, and uninvestigated firemen" constituted a failure of reasonable care, (doc. 72 at 24), and "the question of negligence by lifting someone out of one chair and dropping them on the way to another chair by releasing them [is] within the common knowledge of a lay person." (Doc. 72 at 26).  BMA argues that Mrs. Holmes "misses the point—the issue is not whether Mr. Holmes fell but is instead whether BMA's nurses breached the standard of care when they utilized two firemen to transfer Mr. Holmes to his dialysis chair rather than using a Hoyer lift." (Doc. 77 at 8). BMA further argues that it is "beyond a layperson's knowledge to understand the medical practice of transferring dialysis patients." (Doc. 77 at 9).

The Court agrees with BMA.  The question here is not whether the standard of care was breached because the firemen allegedly dropped Mr. Holmes.  Instead, it is whether

10

the nurses breached their standard of care by utilizing the firemen instead of another method of transfer, such as a Hoyer lift. Thus, this Court must determine whether the decision to use firemen over another method of transfer requires an expert or if it meets the narrow exception.

The Supreme Court of Alabama explained that situations meeting the narrow exception are "when a sponge is left in" a patient after surgery, or "the wrong leg is operated on, or . . . where a call for assistance is completely ignored for an unreasonable period of time." *HealthSouth*, 851 So. 2d at 38. While this list is not exhaustive, it does exemplify the requisite level of obviously wrongful conduct to which the narrow exception applies. *See Collins v. Herring Chiropractic Center, LLC*, 237 So. 3d 867, 871 (Ala. 2017). For example, when a chiropractor placed a cold pack on a patient's knee that, upon removal, led to blisters and scarring, the court found that it "was not necessary for [the patient] to present independent expert testimony where her medical-malpractice case requires common knowledge and experience to understand what is akin to frostbite." *Id.* at 871.

The types of cases that meet the narrow exception are factually distinct from the underlying claims because the proper and appropriate methods of safe transfer of an overweight patient from a wheelchair to a dialysis chair are not generally known outside of the medical field. The tools a medical facility has at its disposal for transferring patients and the determination of when or how to use those tools are not within the common knowledge of the general public. (*See* Docs. 77 at 9, 68-5 at 13). For example, a Hoyer lift

11

requires both initial and annual training to ensure safe use of the machine, and nursing judgment on when to use the machine. (Doc. 68-5 at 13–14, 35).

The allegations in the underlying claims are more akin to the situation in *Tuck*, where expert testimony was required to elaborate on nurses' decision to use a belt restraint to keep a patient in her bed. *Tuck v. Health Care Authority of City of Huntsville*, 851 So. 2d 498, 500 (Ala. 2002). Despite the restraint, the patient managed to fall out of bed and was injured. *Id.* at 500. The Supreme Court of Alabama determined that the issue was "whether [the nurses] breached the standard of care in using, applying, and maintaining the belt restraint on [the patient]." *Id.* at 506. The court held that "expertise was necessary" in the case. *Id.* at 507. Similarly, the issue here is whether the nurses breached the standard of care by using two firemen to transfer Mr. Holmes. Both situations involve nursing judgment on how to safely deal with a specific patient and his individual needs in a specific circumstance given the patient's history and the nurse's knowledge of the tools available. Thus, expertise is necessary for Mr. Holmes' underlying claims.

Mrs. Holmes argues, in the alternative, that the doctrine of *res ipsa loquitor* applies and therefore no expert is necessary. The Supreme Court of Alabama implied in *Ex parte HealthSouth Corp.* that expert testimony would not be necessary where *res ipsa loquitor* applies. 851 So. 2d at 40. Mrs. Holmes argues that *res ipsa* applies here because (1) "[t]he Defendant has control of the instrumentality that caused the injury—in this case, the firemen;" (2) "[c]ommon experience tells us that the injury could not have happened if those in control were not negligent; and" (3) "[t]he Plaintiff's injuries resulted from the accident." (Doc. 72 at 25).

However, "[i]f one can reasonably conclude that the accident could have happened without any negligence on the part of the defendants, then the *res ipsa loquitur* presumption does not apply." *Ex parte Crabtree Indus. Waste, Inc.*, 728 So. 2d 155, 158 (Ala. 1998). It is reasonable to conclude that deciding to use firemen to transport an overweight patient from one chair to another could result in a fall and injury without any negligence on the part of BMA. Without more evidence or arguments in support of a *res ipsa loquitor* determination, this argument fails.

Finally, Mrs. Holmes argues that the transfer of a patient from a wheelchair to a dialysis chair falls within "patient monitoring standards," which do not require expert testimony. (Doc. 72 at 25); *see also HealthSouth*, 851 So. 2d at 39. According to Mrs. Holmes, a jury should be allowed to determine what the "health monitoring standards would require" of a nurse in this situation. (Doc. 72 at 26). The Court disagrees. In *HealthSouth*, the Supreme Court of Alabama stated that juries can use "common knowledge and experience" to determine whether "certain factual scenarios [are exempt from] the general rule requiring an expert under [the] AMLA." *Washington v. Bio-Med. Applications of Alabama, Inc.*, 2018 WL 4355851, at 1 (M.D. Ala. Aug. 8, 2018), *report and recommendation adopted*, 2018 WL 5259466 (M.D. Ala. Oct. 22, 2018). The *HealthSouth* court found that the care at issue (an unnecessary, prolonged wait for a nurse from a patient who needed assistance) was one such factual scenario. 851 So. 2d at 39. However, *HealthSouth* did not open the door for juries to consider "what standard requirements would or should be applied" in any case under the AMLA. (Doc. 72 at 26). Unlike the nurses in *HealthSouth*, who were required to respond to the patient's call in a

13

timely manner, the nurses here had to rely on a nursing judgment about how to move Mr. Holmes from one chair to the other. The decision rendered by the nurses in the situation at bar is beyond that of common knowledge and experience, and an expert is necessary to determine whether the nurses' choice adhered to the proper standard of care.

Mrs. Holmes does not meet the narrow exception to the rule requiring an expert witness to speak to the standard of care, breach, and causation. Thus, this Court finds that an expert witness is necessary to help determine whether the nurses breached their standard of care when they decided to use two firemen to transfer Mr. Holmes from the wheelchair to the dialysis chair instead of a different method of transfer.

### C. Analysis of the Underlying Claims

There is no evidence in the record that Mrs. Holmes has an expert to testify to the standard of care or breach of that standard of care. The only expert that Mrs. Holmes has put forth (albeit untimely) is Dr. Patrick Ryan, and he is only "to be used by the Plaintiffs on the issue of causation." (Doc. 72-6 at 1); (*see also* Doc. 72 at 32) ("Dr. Ryan was designated solely on the issue of causation."). Thus, Mrs. Holmes lacks an expert who can speak to the standard of care and breach, and this lack of an expert is "fatal to recovery to [the underlying] AMLA claim." *Duke v. Atria, Inc.*, 2005 WL 1513158, at 4–5 (M.D. Ala. June 27, 2005); *see also Cobb v. Fisher*, 20 So. 3d 1253, 1259 (Ala. 2009) ("the AMLA and this Court's prior decisions require a plaintiff to present expert testimony to support his or her claims, and, absent the application of an exception, the failure of the plaintiff to do so is usually fatal to his or her claim"); *Fletcher v. Health Care Auth. of City of Huntsville*, 344 So. 3d 347, 353 (Ala. 2021) ("[a]ccordingly, the trial court correctly entered a

summary judgment in favor of the Authority based on Fletcher's failure to present expert medical testimony").

Without expert testimony as to the standard of care and breach, Mrs. Holmes has "failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1294 (11th Cir. 2005). Thus, the underlying claims fail due to lack of expert testimony.

Because the underlying AMLA claims fail, Mrs. Holmes' loss of consortium claim fails as well. A loss of consortium claim is derivative of the claim of the injured spouse. *See Katrensky v. United States*, 732 F. Supp. 2d 1194, 1204–05 (M.D. Ala. 2010) ("[b]ecause Mrs. Katrensky's negligence claim does not survive summary judgment, neither does Mr. Katrensky's loss of consortium claim"); *Ex parte N.P.*, 676 So. 2d 928, 930 (Ala. 1996); *Davis v. Wal-Mart Stores, Inc.*, 64 F. Supp. 2d 1176 (M.D. Ala. 1999); *Johnson v. Wal-Mart Stores, Inc.*, 987 F. Supp. 1398, 1406 (M.D. Ala. 1997) ("[l]oss of consortium is a "derivative" tort which exists only if the defendant is also liable in tort to the spouse who is unable to provide consortium"). The failure of the underlying claims is also the failure of Mrs. Holmes' consortium claim. Therefore, Defendant's motion for summary judgment is due to be granted.

## VI. CONCLUSION

For the reasons stated, it is hereby ORDERED that the Defendant's motion for summary judgment (doc. 66) is GRANTED. It is further

ORDERED that the motion to exclude expert testimony and causation opinions of Patrick G. Ryan, MD (doc. 69) is denied as moot.

A separate final judgment will be entered.

Done this 18th day of December, 2023.

                                        /s/Emily C. Marks
                              EMILY C. MARKS
                              CHIEF UNITED STATES DISTRICT JUDGE